Terry Elizabeth **VILLINES**, Appellee,

v.

**SOONER CHRYSLER–PLYMOUTH, INC.,**
a corporation, Appellant.

No. 46531.

Court of Appeals of Oklahoma,
Division No. 2.

Feb. 11, 1975.

As Amended March 21, 1975.

Rehearing Denied April 10, 1975.

Certiorari Denied May 20, 1975.

Released for Publication by Order of Court
of Appeals May 22, 1975.

**1012**

Ed Abel, Lampkin, Wolfe, Burger, Abel, McCaffrey & Norman, Oklahoma City, Rex K. Travis, Gerald E. Durbin, II, Oklahoma City, for appellee.

Warren F. Bickford, IV, Legal Intern (Travis & Jordan, Oklahoma City, of counsel), for appellant.

BRIGHTMIRE, Judge.

This action is against an Oklahoma City automobile dealer, Sooner Chrysler-Plymouth, Inc., by one of its customers, Mrs. Terry Villines, to recover damages for personal injuries sustained when the brakes suddenly failed on a 1966 Plymouth "courtesy car" furnished her by Sooner while her automobile was being repaired. Plaintiff achieved a verdict of $16,000 against the dealer who seeks a reversal of the judgment entered thereon on two grounds: (1) the trial court should have directed a verdict for defendant because plaintiff's proof was insufficient to establish any liability of defendant for the mishap; (2) the trial court did not instruct on defendant's defense of contributory negligence arising from plaintiff's failure to use the emergency brake when the primary braking system failed.

It was shortly after noon on a pretty spring day in May 1971 when the 27-year-old plaintiff was returning home from Sunday church services with her four young children in the "loaner" car. She was traveling south on Pennsylvania Avenue about 35 m. p. h. when the signal light facing her about half a block or less ahead at Southwest 25th Street changed to amber. Plaintiff stepped on the brake pedal, it went all the way to the floor and to her dismay "there weren't any. By this time," she said, "I was up to the intersection, and the cars were starting to take off [on 25th Street], and I honked, and the guy going east . . . I thought he was going to stop. I was trying to go around him to miss, and I hit him."

Besides honking, she said "The only thing I could think of was force it [the gear] up into park or something to stop. . . . It grinded. I pushed and pushed, and it just was grinding." She never was able to get it there. Plaintiff was taken to the hospital from the scene because of sickness and injuries received.

An expert brake mechanic testified on behalf of plaintiff that he had examined the wrecked Plymouth. He found that the

"star adjuster"[1] had gotten loose on an earlier stop—perhaps a "panic" one—and came out of its proper place in the right front brake assembly causing the brake failure, because "the brake lining . . . was 80% used. . . . getting real thin." Another expert opined the star adjuster ejection preceded the impact and did so because it earlier came loose "in the slots"—a condition that was discoverable by means of a reasonable pre-accident inspection of the braking system. This witness, who had been an "automotive serviceman" for a Chevrolet agency for 20 years and had inspected the Plymouth in question, said he found among other things that the emergency brake "pedal was down against the carpet"—a condition he regarded as abnormal.

According to a man employed by Sooner at the time of the wreck, the 1966 Plymouth was taken from the used car lot and given to the body shop to use as a "loaner." It was not a car in top shape ready for sale he said, and added that even though the car was loaned out to customers a lot, "I was more concerned that they would try to take care of the car, so I would have a car to loan to someone else." Hence, he did not inspect or repair the car unless someone complained about something or, as he put it, "I seen something myself." Neither did he ever have an expert mechanic give the car a good inspection because it would have to have been done by a commissioned employee of Sooner, and "it's expensive." He says when the damaged car was returned to the Sooner shop he checked the brakes and it had none. He "started the motor up and checked the emergency brake . . . and . . . the brake cable would stop the car," so he moved the car to another part of the building and removed the wheel.

1. Diagram of self-adjusting braking mechanism.

| | |
|---|---|
| (1) | Star Adjuster |
| (2) | Star Shaped Metal Wheel |
| (3) | Threads which the Star Adjuster screws in and out maintaining proper distance |
| (4) | Notched ends of Star Adjuster |
| (5) | Wheel Cylinder |
| (6) | Brake Drum fits in this area |
| (7) | Springs |
| (8) | Ratchet Device |
| (9) | Backing Plate |
| (10) | Brake Shoes |
| (11) | Brake Lining |

Defendant put the investigating police officer on the stand who said plaintiff told him at the scene that the brakes failed on the Plymouth and that she tried to put the gear in park. The officer tried the brakes and found the pedal went effortlessly to the floorboard. The report he filed was consistent with these facts. He recorded nothing about tire or skid marks or lack of transmission damage. Nevertheless, at trial, though admitting his report contained nothing about tire or skid marks, the officer testified he recalled (in February 1973 without benefit of any recollection note or memorandum) that there was "a skipping skid mark effect. . . . not solid or black, which . . . I did not measure . . . ." left by plaintiff's vehicle. Moreover after filing his report the officer got to "thinking about it . . . . So . . . ." said he, "I went back to the place where the vehicle was stored and checked the transmission . . . and [it] was in perfect working order." He admitted such a follow-up investigation was unusual.

Plaintiff's petition alleged both breach of warranty and negligence. However, the case was tried and sent to the jury on the sole theory that plaintiff's injuries resulted from the "negligence of the defendant in furnishing plaintiff a car that was unsafe to drive."

Defendant premises its first proposition —insufficiency of plaintiff's evidence to establish a prima facie case—on a failure to prove the three essential elements described in Casey v. Beaudry Motor Co., 83 Ariz. 6, 315 P.2d 662 (1957), namely:

"(1) that the brakes were defective;

(2) that such defective condition of the brakes was the proximate cause of the injury; and

(3) that the defendant knew or by the exercise of reasonable care ought to have known the brakes were defective at the time the automobile was delivered to the plaintiff."

Assuming that this quote correctly outlines the basis for a charge of negligence under the facts of this case, we do not agree with defendant that there was inadequate direct or circumstantial evidence to justify a jury finding on all three elements.

 First off it is well to bear in mind that each of the elements may be proved by circumstantial evidence—a rule having particular applicability here because of Sooner's presumed superior, if not unique, knowledge or means of knowing about the Plymouth's condition when it turned the car over to plaintiff. Fletcher v. Meadow Gold Co., Okl., 472 P.2d 885 (1970); Orthopedic Clinic v. Hanson, Okl., 415 P.2d 991 (1966).

Defendant does not seriously contend the first two elements are unproved. The main thrust of its argument is aimed at the third one, concerning which it says, ". . . [T]he Court must determine whether Plaintiff proved that Defendant knew or should have foreseen, at the time they loaned the car, that it was probable that the star adjuster would dislodge if they did not repair the brakes . . . ."

We think, however, this is not quite what we must determine. Casey, the main case defendant relies on, refers to the issue as being whether the bailor had knowledge "either actual or implied, of the defective brake condition." It does not suggest that the supplier of the chattel must be shown to have foreseen precisely what course the defect would take in a subsequent brake failure.

As a matter of fact the circumstances said in Casey to have been inadequate to support the third element differed substantially from what we have here in at least these two respects: (1) the investigating officer said he found "a three-quarter pedal" when he tested it with both hard and slow pressure following the wreck, which he characterized as an "extremely good brake"; (2) there was no evidence that defendant had not properly inspected the brakes on the car leaving uncontradicted defendant's evidence that it repaired and

adjusted them "very shortly before plaintiff Casey drove [the car] out of their used car lot."

In the case at bar there was no dispute about the fact that the Plymouth brake pedal went to the floorboard following the wreck corroborating plaintiff's statement that it did so as she approached the accident scene. A defect in the braking system which caused the collision she therefore proved. What was the nature of the defect? Post-accident investigation disclosed the immediate cause of the brake failure to be a dislodged star adjuster. Just when it became displaced could not be shown with certainty. But evidence there was as to why it became displaced. One expert, for instance, opined that the brake shoe or lining was "80% worn out" and was too thin—a defect which contributed to the adjuster failure and one easily detectable by an ordinary visual inspection before releasing the car to plaintiff. True a defense witness (the brother of plaintiff's expert!) conflictingly said he thought the lining was only about 50 percent gone so that he would "recommend kind of keeping an eye . . . . At that time I do not think I would suggest a brake job . . . . I would tell the owner to keep an eye on it and a brake job would be coming up," but this created no more than a dispute for jury resolution.

■ These and other circumstances prevent us from concluding as a matter of law that the jury was not justified in inferring that the brakes on the Plymouth were in need of repair when turned over to plaintiff, that such need was discoverable by means of a reasonable inspection, and defendant's failure to do so fell short of ordinary care and caused the collision and plaintiff's injuries.

Defendant's other contention is that the trial court reversibly erred in refusing to give a contributory negligence instruction in view of evidence that plaintiff "did not apply the emergency brake on her automobile when the foot brakes suddenly failed" although it "was working properly." Defendant reminds us it both pleaded the defense and requested an instruction on it and we notice it sure enough did.[2]

Plaintiff on the other hand hails the instructional omission saying there was no evidence adduced in the case to justify giving it. If plaintiff's analysis of the evidence is correct then not only should the charge not have been given, but it would have been reversible error to do so. Mouser v. Talley, Okl., 375 P.2d 968 (1962).

Defendant's argument calls upon some language used in Tyree v. Dunn, Okl., 315 P.2d 782 (1957) as a point of departure, namely: "He [defendant] admitted he was 20 feet behind plaintiff's car when he discovered his brake was out. He further admitted that he had an emergency brake, but that he did not use it." The context surrounding this quote destroys its usefulness in the present case. It appears in the midst of what the court called "a brief résumé of the evidentiary matters," which it recited to support its conclusion that the defendant had not done "everything . . . within human power to avoid the accident," so that giving an unavoidable accident instruction to the jury was reversible error.

But here we are not at all concerned with whether plaintiff did everything humanly possible to avoid the wreck after the brakes failed. Rather we are to determine only whether there is any evidence in the record to support a finding of negligence on the part of plaintiff which contributed to the cause of the wreck. And in order to do so we must consider each of the essential elements of the common law tort. First, of course, she had a duty to use reasonable care to avoid injuring herself. This is no problem. But whether she breached this duty under the circumstances, and if so, whether such breach was a contributory cause of the accident, are problems.

---

2. The statutory enactment of the 1973 comparative negligence law was not until several months after this case was tried in February 1973.

██ In regard to whether Mrs. Villines breached a common law duty to use reasonable care, we have to examine the relevant evidence. It is not disputed by circumstance or otherwise that plaintiff was traveling about 35 miles per hour "between a half . . . and a fourth of a block" away from an intersection ahead when she saw the signal light change from green to yellow. We judicially notice that a city block is usually thought of as being a little less than 400 feet long. This means then that at the moment plaintiff first discovered she must start to stop her car she was about 100 to 200 feet away from the stopping place traveling about 51 feet per second. Normal reaction time of about three-fourths of a second would elapse before she starts to depress the brake pedal during which time the car advances to within 62 to 162 feet of the intersection. At this point she discovers a failure of her brakes. This startling development will require the lapse of at least another two seconds of both trying the brake and reaction time to think of and try to use some alternative means of stopping the car, which by now has advanced 138 feet to a point either in or within 62 feet of the intersection. Assuming (the record does not disclose) the point of impact is 50 feet within the intersection plaintiff now has a tick of the watch more than two seconds to look underneath the left end of the dashboard, locate and depress the emergency brake. One would have to indeed be swift, agile, and as it were lucky to be able —while hanging onto the steering wheel and watching ahead for a chance to avoid disaster—to find, much less efficiently utilize, a small pedal (if that is what it was) located in an out-of-the-way place presumably up under the left-hand side of the dash in the medium-sized car. This we think no reasonable person could expect Mrs. Villines to do in the space of one to three seconds after the shock of having her brake pedal slide impotently to the floorboard, especially when it would require her to raise an untrained left leg and stab at the unfamiliar pedal with sufficient accuracy and force to stop the vehicle before the impact.[3]

The other cases cited by defendant dealing with emergency brakes all call for consideration of the particular circumstances involved and are therefore not at war with our conclusion here.

██ But even if the foregoing were to be considered within the realm of reasonableness, there still remains the problem of a causal connection between the breach and the wreck. In this regard we find no evidence concerning the efficiency or capability of the emergency brake as it relates to stopping a car moving at 35 m. p. h. The only evidence in the record is the testimony of the Sooner body man who loaned the car out to the effect that he found the emergency brake worked well enough to keep the car from rolling when he moved the vehicle in the body shop—presumably at a speed of one mile an hour or less. Absence of evidence upon which to base a finding that—if applied within two to three seconds after discovery of the main brake failure—the emergency brake would have brought the vehicle to a stop near the threshold of the intersection, furnished the trial court with another reason for rejecting an instruction on the unproved defense of contributory negligence.

Affirmed.

NEPTUNE, P. J., and BACON, J., concur.

---

3. Compare similar reasoning applied to an analogous situation in Mouser v. Talley, Okl., 375 P.2d 968 (1962) holding that "period of time between starting of automobile . . . and collision" was not long enough to justify a finding that guest passenger breached a duty to protest negligent action of the driver in making a turn, so that an instruction on contributory negligence of the guest was properly refused.